FILED
2009 Apr-29 PM 02:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

AO91 (Rev. 5/93 ND/AL) Criminal Complaint

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA

### CRIMINAL COMPLAINT

**UNITED STATES OF AMERICA**

MAG 09        102

v.                                    **CASE NUMBER:**

**FRANCISCO BAUTISTA-DUENAS,**
    *also known as, "Primo,"*
    *also known as, "El Primo,"*
    *also known as, "The Cousin,"*
    *also known as, "Freddy Picasso,"*
    *also known as, "Johnny Navarrete,"*
    *also known as, "Fernando Damian,"*
    *also known as, "Fernando,"*
    *also known as, "Amigo"*
**LEONEL SOTO,**
    *also known as "Ramadan,"*
**RICHARD RAY OLDHAM,**
    *also known as "Ricky,"*
**LUIS ESPARZA,**
    *also known as "Luis Herrera"*
**and**
**ANNE F. WOODS,**
    *also known as "Roszanne F. Woods"*

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From in or about November 2008 to in or about April 2009, in JEFFERSON County and SHELBY County in the Northern District of Alabama and elsewhere, the defendants, **FRANCISCO BAUTISTA-DUENAS, LEONEL SOTO, RICHARD RAY OLDHAM, LUIS ESPARZA** and **ANNE F. WOODS** did knowingly and unlawfully conspire with others both known and unknown to possess with the intent to distribute and to distribute 50 grams or more of methamphetamine, and 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine hydrochloride, each a controlled substance,

in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A); and 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a controlled substance, in violation of Title 21, United States Code, Section 841 (a)(1) and (b)(1)(B), all in violation of Title 21, United States Code, Section 846. I further state that I am Special Agent of the United States Drug Enforcement Administration, and that this complaint is based on the following facts:

**(SEE ATTACHED AFFIDAVIT)**

_____
Patrick Wilson, Special Agent
Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

___April 28, 2008___ @ 2:20pm.        At    ___Birmingham, Alabama___
Date                                              City and State

United States Magistrate Judge                _____
Title of Judicial Officer                     Judge John E. Ott

## AFFIDAVIT

I, Patrick B. Wilson, being duly sworn, depose and say:

1. I have been employed with DEA as a Special Agent since October 1995 and during my employment, I have been involved in numerous investigations that involved narcotics trafficking offenses and activities. I have received special training in the enforcement of laws concerning controlled substances. I have also participated in numerous investigations that involved the seizure of large quantities of controlled substances, substantial sums of cash, conveyances, real property, firearms, cellular telephones and pagers.

2. While assigned to the DEA Los Angeles, California office, I spent three years working exclusively on Southeast Asian Heroin investigations targeting Thai and Chinese nationals involved in the importation and distribution of heroin. I also spent three years assigned to an enforcement group which focused primarily on Mexican nationals involved in the importation and distribution of cocaine and methamphetamine from Mexico into Southern California. During this period, I worked with numerous Mexican confidential informants, who provided a wealth of information regarding the intricacies of the processes and methods, to include codes, used by Mexican drug traffickers, particularly in the trade of cocaine and methamphetamine.

3. Following the Los Angeles assignment, I was assigned to the DEA La Paz Bolivia, office at the United States Embassy in La Paz, Bolivia. Prior to this assignment I attended a six month Spanish language immersion course in Virginia. While assigned to Bolivia, I was involved in numerous investigations with host nation counterparts of Bolivian, Colombian, Argentinean, Chilean, and Peruvian cocaine traffickers involved in exporting cocaine from Bolivia to Europe. I was also involved in assisting Bolivian host nation counterparts as a United States advisor during jungle patrols to detect and destroy cocaine laboratories in the coca growing regions of Bolivia. During this four year assignment to Bolivia, I became well educated on the smuggling techniques used by South American cocaine traffickers and traveled extensively throughout South America and Europe during numerous joint cocaine investigations involving a number of foreign nations.

4. During my twelve year career, I have attended sixteen weeks of Basic Agent Training, Tactical Diagramming Course, Conspiracy and Complex

Investigations Course, Counter Drug Narco Terrorism Personal Protection Course, Internet Telecommunications Exploitation Program, and the Basic Telecommunications Exploitation Program Course.

5. During the course of an eight month investigation, DEA has uncovered a ring of individuals who are responsible for distributing cocaine, marijuana, and methamphetamine primarily in Jefferson, Chilton, and Shelby Counties of Alabama; as well as North Carolina and Georgia. These individuals include **FRANCISCO BAUTISTA-DUENAS, LEONEL SOTO, RICHARD RAY OLDHAM, LUIS ESPARZA, ANNE F. WOODS, HECTOR ALONZO ESPINOZA,** and **PEDRO ANTONIO CORNEJO**. During the course of this investigation to date, your affiant has learned that Francisco Bautista-Duenas operates as a high-level distributor and broker for the organization and is based in Calera, Alabama. Richard Ray Oldham is a mid-level distributor who operates out of Trussville, Alabama. Leonel Soto and Luis Esparza assist Francisco Bautista-Duenas in his day-to-day operations. While Soto and Esparza live in Jemison, Alabama, they distribute drugs for Bautista-Duenas in Jefferson and Shelby Counties, and travel to Georgia and to North Carolina to run drugs and money for Bautista-Duenas. Anne Woods is the courier for the organization. She resides in Jemison, Alabama, but makes frequent trips to Georgia and North Carolina to transport large amounts of money and drugs. Hector Alonzo Espinoza is a mid-level distributor who operates out of North Carolina. Pedro Antonio Cornejo is a courier for the organization. He resides in California and was arrested transporting 14 pounds of methamphetamine cross-country.

6. Your affiant has learned that this organization operates primarily in the tri-county area of Jefferson, Shelby, and Chilton counties, of Alabama. Your affiant has learned Francisco Bautista-Duenas, directs the distribution activities of Leonel Soto, Luis Esparza, Anne Woods, Richard Ray Oldham, Hector Alonso Espinoza and Pedro Antonio Cornejo. This organization is believed to be responsible for distributing hundreds of pounds of marijuana, multiple pounds of methamphetamine and multiple kilograms of cocaine every week.

7. In November 2008, agents of DEA developed a reliable confidential source (CS#1) that has proven to be truthful, reliable and accurate in the past. CS#1 was a party to and overheard certain conversations between BAUTISTA-DUENAS and his associates. Information provided by this reliable

confidential source has been corroborated and verified through independent investigation and found to be completely credible and accurate at all times.

8. Through CS#1, your affiant learned of the drug trafficking activities of Francisco BAUTISTA-DUENAS. Specifically, according to CS#1, on November 13, 2008, Bautista-Duenas sent his associate, Leonel Soto, a.k.a. "Ramadan" to deliver a 500 grams of cocaine hydrochloride to a mid-level drug distributor. According to CS#1, BAUTISTA-DUENAS advised this distributor that he (BAUTISTA-DUENAS) had kilograms of cocaine available at $22,000 per kilogram. CS#1 further overheard Leonel SOTO and the mid-level drug distributor discussing the half kilogram of cocaine that Soto would deliver, at the direction of BAUTISTA-DUENAS.

9. Your affiant learned from CS#1 that on November 13, 2008, SOTO called the mid-level drug distributor to let him know that SOTO was outside his apartment ready to deliver a half kilogram of cocaine as arranged by BAUTISTA-DUENAS. At the same time, agents from the DEA Birmingham District Office were conducting surveillance outside the apartment of the mid-level drug distributor, when Special Agent Donald Bennett observed a 1992 Nissan Sentra park in the vicinity of the mid-level drug distributor's apartment. Moments later, Special Agent Bennett observed the mid-level drug distributor walk to the Nissan Sentra and appear to meet with the occupants. At approximately 9:55 p.m., Special Agent Bennett observed the mid-level drug distributor walk toward his apartment building and further observed the Nissan Sentra depart the area. Your affiant believes that, based on the information supplied by CS#1 and the observations of Special Agent Bennett, the occupant of the Nissan Sentra was LEONEL SOTO, a.k.a.RAMADAN, and that he delivered half a kilogram of cocaine to the mid-level drug distributor during their short meeting in the parking lot.

10. Your affiant learned from CS#1 that on November 15, 2008, CS#1 overheard BAUTISTA-DUENAS inquire as to whether the mid-level drug distributor had sold the half kilogram of cocaine delivered to him on November 13, 2008. CS#1 advised your affiant that he/she heard the mid-level drug distributor inform BAUTISTA-DUENAS that he had not sold it. Information from CS#1 along with surveillance conducted by DEA revealed that BAUTISTA-DUENAS again sent SOTO to the mid-level drug distributor, but this time SOTO picked up the half-kilogram of cocaine to return to BAUTISTA-DUENAS.

11. On November 16, 2008, at approximately 1:04 p.m., agents from the DEA Birmingham District Office were conducting surveillance outside the apartment of the same mid-level drug distributor, when Special Agent Joe Wooldridge observed a black 2003 Ford Expedition park in the vicinity of the apartment. Moments later, Special Agent Wooldridge observed the same mid-level drug distributor walk to the Ford Expedition and appear to meet with the occupant. At approximately 1:09 p.m., Special Agent Wooldridge observed the mid-level drug distributor walk toward his apartment building and further observed the Ford Expedition depart the area. Based on information obtained through CS#1 and the observations of Special Agent Wooldridge, your affiant believes that the occupant of the Ford Expedition was Leonel SOTO and that SOTO recovered half a kilogram of cocaine from the same mid-level drug distributor during this meeting.

12. In December 2008, agents of DEA developed another reliable confidential source (CS#2) that has proven to be truthful, reliable and accurate in the past. CS#2 was a party to and overheard certain conversations between BAUTISTA-DUENAS and his associates. Information provided by this reliable confidential source (CS#2) has been corroborated and verified through independent investigation and found to be completely credible and accurate at all times.

13. Your affirant learned from CS#2 that, on December 28, 2008, SOTO advised BAUTISTA-DUENAS that he (SOTO) was going to "Ricky's," to deliver an unknown quantity of drugs to "Ricky." According to CS#2, BAUTISTA-DUENAS then advised SOTO that he (BAUTISTA-DUENAS) would be in the area of "Ricky's" and instructed SOTO to drop off the drugs, and that BAUTISTA-DUENAS would meet SOTO afterwards. After consultation with other investigators from DEA, your affiant determined that "Ricky" is RICHARD RAY OLDHAM, a known marijuana and methamphetamine trafficker in the Trussville, Alabama, area who has surfaced in other DEA investigations. Surveillance agents then traveled to OLDHAM's last known residence, 108 Wildwood Drive, Trussville, Alabama. At approximately 1:05 p.m., at this residence, Task Force Agent John Walker observed a 2003 Ford Expedition, bearing Alabama license 58722AW, parked at the residence. This vehicle was been previously observed by surveillance agents being driven by SOTO earlier in this investigation.

14. Surveillance agents continued to observe the Ford Expedition and at 1:11 p.m. Task Force Agent Walker observed two Hispanic males depart the residence in the Expedition. As the Expedition departed the subdivision, Task Force Agent Chris Walls observed a green Ford F-150 truck, bearing Alabama license AW18271, travel in tandem with the Expedition. Surveillance was maintained on both vehicles and at approximately 1:27 p.m., Task Force Agent Walker observed the Expedition stop on the on ramp to Interstate 20 East at Old Leeds Road. Task Force Agent Walker then observed the green Ford truck stop near the Expedition and observed two Hispanic males exited the green truck. Task Force Agents Walker and Walls then observed the two occupants of the green truck and the two occupants of the black Expedition walk to the bed of the truck. All four subjects appeared to be moving objects around in the bed of the truck. Surveillance was maintained on both vehicles, which subsequently drove in tandem to a Mexican restaurant in Pelham, Alabama, and later to a residence located at 5185 County Road 42, Jemison, Alabama, a residence determined earlier in this investigation to be the residence for SOTO. Based on the information obtained from CS#2 and the observations of agents on surveillance, agents believe that SOTO delivered an unknown quantity of drugs to OLDHAM at his residence, under the direction of BAUTISTA-DUENAS.

15. In January 2009, agents of DEA developed yet another reliable confidential source (CS#3) that has proven to be truthful, reliable and accurate in the past. CS#3 was a party to and overheard certain conversations between BAUTISTA-DUENAS and his associates. Based upon information gathered from CS#3, approximately 14 pounds of methamphetamine were recovered that were associated with BAUTISTA-DUENAS' organization.

16. Your affiant learned from CS#3 that, on January 17, 2009, CS#3 heard BAUTISTA-DUENAS talking to LUIS ESPARZA about picking up drug proceeds, referred to as "tickets," from an unknown customer. According to CS#3, BAUTISTA-DUENAS and ESPARZA then talked about a pending trip in which BAUTISTA-DUENAS told ESPARZA that ESPARZA would be picking up money.

17. Your affiant further learned from CS#3 that, on January 17, 2009, BAUTISTA-DUENAS called ANNE WOODS. During the course of my investigation, your affiant has learned that WOODS is BAUTISTA-DUENAS' female courier. According to CS#3, BAUTISTA-DUENAS asked if WOODS was awake, then

he told her that he was going to come get the truck. CS#3 heard WOODS say that she was waiting for him. Based upon information obtained through CS#3 and surveillance, your affiant believes that BAUTISTA-DUENAS was preparing to send WOODS on an errand in her truck. Your affiant knows that WOODS has a Chevrolet Tahoe with handicap plates registered to her.

18. Your affiant also learned from CS#3 that, on January 18, 2009, CS#3 heard WOODS call BAUTISTA-DUENAS to complain by saying, "I am in the middle of nowhere. I have been driving for almost an hour and a half. I drove for over an hour and then I finally found this guy at the Burger King and now we have driven another 30 minutes and I have no clue where I am. I'm in a corn field with a house and a garage. He says they were going to put it in the garage and they are waiting for some guy to bring the key to the garage. There are three guys but one of them I think I know two of them. One of them you brought up there last night and the other one I think I have seen before. Is this what is suppose to be going on?" According to CS#3, BAUTISTA-DUENAS reassured WOODS, telling her that "they are good people" Your affiant believes that Anne WOODS was taken to a remote area of North Carolina to off load cocaine BAUTISTA-DUENAS gave her prior to the trip and that she is concerned for her safety and unsure if she is supposed to be at such a remote location. Agents of the Greensboro Resident Office of the DEA conducted surveillance of WOODS and confirmed that WOODS was indeed in North Carolina. CS#3 also revealed that, later that same night, CS#3 heard WOODS ask BAUTISTA-DUENAS for permission to stay another night in Goldsboro, North Carolina, so that she could rest before driving back to Alabama with the proceeds from the cocaine she had delivered in North Carolina.

19. Your affiant learned from CS#3 that, on January 20, 2009, CS#3 heard WOODS tell BAUTISTA-DUENAS that "they" are on I-20. According to CS#3, BAUTISTA-DUENAS instructed her to drive on to Alabama. Based upon information gathered from CS#3 and other investigative techniques, your affiant believes that WOODS and ESPARZA were driving in tandem back to Alabama.

20. Your affiant learned from CS#3 that, on January 23, 2009, BAUTISTA-DUENAS again arranged for WOODS to travel to North Carolina. Based upon information received from CS#3, agents conducted surveillance in Jemison, Alabama. CS#3 indicated that in the early morning of January 23, 2009, WOODS asked BAUTISTA-DUENAS for spending money for expenses.

Your affiant also learned from CS#3 that BAUTISTA-DUENAS then requested that one of his associates supply WOODS with $500 and then arranged for his associate to meet WOODS at the McDonald's in Jemison. Your affiant was able to observe this meeting and observed one of BAUTISTA-DUENAS' associates as he met with WOODS and handed her an envelope. Your affiant believes that WOODS then traveled to North Carolina.

21. On January 23, 2009, surveillance agents in North Carolina observed WOODS as she met with several Hispanic men and drove in tandem with them for some distance. According to CS#3, the Hispanic men became concerned that they were being followed. At this time, agents on surveillance in North Carolina broke off surveillance.

22. Your affiant learned from CS#3 that on January 24, 2009, BAUTISTA-DUENAS was in North Carolina, traveled to Georgia, but then planned to return to North Carolina. According to CS#3, BAUTISTA-DUENAS had discussions with his associates to organize the meeting between WOODS and BAUTISTA-DUENAS' associates in North Carolina. Your affiant learned from CS#3 that BAUTISTA-DUENAS and his associates were concerned over law enforcement action, therefore, BAUTISTA-DUENAS directed WOODS to travel on roadways that are not likely to be monitored by law enforcement.

23. Your affiant learned from CS#3 that, on January 26, 2009, CS#3 heard OLDHAM and BAUTISTA-DUENAS discussing OLDHAM purchasing fifty pounds of marijuana from BAUTISTA-DUENAS for $650.00 per pound. According to CS#3, BAUTISTA-DUENAS then told OLDHAM that Anne WOODS was driving with money for payments for drugs and that WOODS would make a separate trip because BAUTISTA-DUENAS' associates did not want WOODS to carry money and drugs together in the same trip.

24. Your affiant further learned from CS#3 that, on January 26, 2009, CS#3 heard BAUTISTA-DUENAS continuing to talk to OLDHAM and WOODS about meeting so that OLDHAM could get the load of fifty pounds of marijuana from WOODS. According to CS#3, OLDHAM called BAUTISTA-DUENAS and BAUTISTA-DUENAS asked OLDHAM where he wanted to meet WOODS. CS#3 also revealed that BAUTISTA-DUENAS told OLDHAM that the load would contain "two big bags and one small one." According to CS#3, BAUTISTA-DUENAS then told OLDHAM that OLDHAM was to keep the "big one" and "it's about 50" and then told OLDHAM to leave the "other one,

the 16" inside the truck. CS#3 then revealed to your affiant that BAUTISTA-DUENAS further told OLDHAM that he (BAUTISTA-DUENAS) would give OLDHAM "the old lady's number." Your affiant believes that "the old lady" is Anne WOODS. According to CS#3, BAUTISTA-DUENAS called OLDHAM back to give him (OLDHAM) "her number" so that OLDHAM could tell "her" where he (OLDHAM) would meet "her." CS#3 further revealed to your affiant that CS#3 heard BAUTISTA-DUENAS give OLDHAM the number 205-482-5418, the number that your affiant has connected to Anne WOODS. Also according to CS#3, OLDHAM told BAUTISTA-DUENAS that he called "Anne" and that she was confused about meeting OLDHAM. CS#3 revealed that BAUTISTA-DUENAS then called Luis ESPARZA and instructed ESPARZA to tell WOODS that "Ricky" would be calling call her.

25. Your affiant learned from CS#3 that WOODS did meet OLDHAM and made the delivery of marijuana. CS#3 further revealed to your affiant that, on January 27, 2009, BAUTISTA-DUENAS determined that the amount of marijuana was closer to 64 pounds. According to CS#3, BAUTISTA-DUENAS instructed OLDHAM to return four pounds of the marijuana in the load that Woods delivered the night before.

26. Your affiant learned from CS#3 that BAUTISTA-DUENAS maintained contact with OLDHAM about the amount of marijuana from the load that OLDHAM had distributed. As an example, CS#3 revealed that, on January 29, 2009, OLDHAM told BAUTISTA-DUENAS that the marijuana was "beautiful." According to CS#3, OLDHAM went on to add that the marijuana is "better than anything I've seen. Stuff like you see in a magazine. Like *High Times*, you know? Have you ever seen that magazine *High Times*?" Your affiant is familiar with the publication *High Times* and knows that it is a magazine containing information about marijuana.

27. Your affiant learned from CS#3 that, in late January and early February 2009, BAUTISTA-DUENAS had numerous conversations about a shipment of methamphetamine, which would be hidden on a tractor trailer truck in California and driven across county and delivered to BAUTISTA-DUENAS. According to CS#3, in these conversations, BAUTISTA-DUENAS discussed using a truck driver named "Toni" to make this delivery. CS#3 revealed to your affiant that BAUTISTA-DUENAS talked with "Toni" several times and instructed "Toni" to deliver the drugs to him in Greensboro, North Carolina.

According to CS#3, during these conversations, "Toni" said he had legitimate cargo destined for New York and that after delivering the legitimate cargo he would then divert to North Carolina and deliver the drugs to BAUTISTA-DUENAS. Your affiant learned from CS#3 that BAUTISTA-DUENAS talked to OLDHAM about the upcoming delivery of methamphetamine.

28. Your affiant passed on the information about "Toni" gathered from CS#3 to other DEA agents. Based upon the information from CS#3 and other investigative techniques, on February 8, 2009, "Toni" was approached by other DEA agents at a weigh station in New Jersey and his truck was searched after a canine alerted on his truck indicating the presence of drugs. Your affiant learned that agents with DEA in Newark, New Jersey, who searched "Toni's" truck, discovered approximately 14 pounds of methamphetamine hidden inside a compartment located inside the cab of the tractor-trailer unit.

29. Your affiant learned from CS#3 that, on February 11, 2009, CS#3 heard BAUTISTA-DUENAS expressing increasing concern that neither he nor his associates had been able to get in touch with "Toni." According to CS#3,

BAUTISTA-DUENAS and his associates discussed sending someone to "Toni's" residence in California to check on his whereabouts.

30. In March 2009, agents of DEA developed yet another reliable confidential source (CS#4) that has proven to be truthful, reliable and accurate in the past. CS#4 was a party to an overheard certain conversations between BAUTISTA-DUENAS and his associates.

31. Your affiant continued to gather information about BAUTISTA-DUENAS from CS#4. CS#4 revealed to your affiant that on March 5, 2009, BAUTISTA-DUENAS was making arrangements to obtain more narcotics and to collect money. For example, according to CS#4, BAUTISTA-DUENAS talked to a source of supply in Mexico to set up a drug transaction. According to CS#4, BAUTISTA-DUENAS explained that he was "looking around for *those*" (narcotics), and that he was "offering them," but needs "something to show for them." CS#4 revealed to your affiant that the source of supply of narcotics in Mexico said that he would try to obtain "some" to show to BAUTISTA-DUENAS and that BAUTISTA-DUENAS said that he had told "Ricky" (OLDHAM) that he (BAUTISTA-DUENAS) would give "them" to Ricky for a good price and that Ricky agreed. According to CS#4, the source of supply

of narcotics then stated that he would send his associate to obtain "ten or fifteen" for BAUTISTA-DUENAS.

32. Based upon information received from CS#1, CS#2, CS#3, CS#4, surveillance, and other investigative techniques, your affiant believes that BAUTISTA-DUENAS and his associates are continuing to conduct their drug trafficking operation in the Northern District of Alabama and beyond.

WHEREFORE, based upon the above, your Affiant has probable cause to believe that **FRANCISCO BAUTISTA-DUENAS, LEONEL SOTO, RICHARD RAY OLDHAM, LUIS ESPARZA, ANNE F. WOODS**, did knowingly and unlawfully conspire with others both known and unknown to possess with the intent to distribute and to distribute 50 grams or more of methamphetamine, and 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine hydrochloride, each a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A); and 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a controlled substance, in violation of Title 21, United States Code, Section 841 (a)(1) and (b)(1)(B), all in violation of Title 21, United States Code, Section 846.

Patrick Wilson, Special Agent
Drug Enforcement Administration

Sworn and subscribed to me this 28th day of April, 2009.

JOHN E. OTT
UNITED STATES MAGISTRATE JUDGE
United States District Court
Northern District of Alabama